Slip Op. 07-128

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                          :
KOYO SEIKO CO., LTD. et al.,              :
                                          :
                                          :
              Plaintiffs,                 :
                                          :        Before:        WALLACH, Judge
       v.                                 :        Consol. Court No.:   05-00560
                                          :
UNITED STATES,                            :
                                          :        PUBLIC VERSION
              Defendant,                  :
                                          :
and                                       :
                                          :
TIMKEN US CORPORATION et al.,             :
                                          :
              Defendant-Intervenors.      :
_____:
```

[Plaintiffs' Motions for Judgment Upon the Agency Record are DENIED, and the Government's determination is AFFIRMED]


Dated: August 23, 2007

Sidley Austin LLP (Neil R. Ellis) for Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Hogan & Hartson LLP (Craig Anderson Lewis, T. Clark Weymouth and Shubha Sastry) for Plaintiff Nankai Seiko Co., Ltd.

Baker & McKenzie LLP ( Kevin M. O'Brien and Kevin J. Sullivan) for Plaintiffs Nippon Pillow Block Co. Ltd. and FYH Bearing Units USA Inc.

Crowell & Moring LLP (Matthew Philip Jaffe, Robert A. Lipstein, Alexander H. Schaefer and Sobia Haque) for Plaintiffs NSK Corporation, NSK Ltd., and NSK Precision America, Inc.

Baker & McKenzie LLP, (Donald J. Unger, Diane A. MacDonald, Louisa Vassileva Carney and Paul E. Amberg) for Plaintiffs American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); and David W. Richardson, Mykhaylo Gryzlov, Hardeep Josan, Kemba Eneas and Jennifer J. Johnson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

Stewart and Stewart (Terence P. Stewart and Geert M. De Prest) for Defendant-Intervenor Timken US Corporation.

## OPINION

**Wallach, Judge:**

# I
# INTRODUCTION

Plaintiffs Koyo Seiko, Co., Ltd., and Koyo Corporation of U.S.A. (collectively "Koyo"); Nippon Pillow Block Co. Ltd. and FYH Bearing Units USA, Inc. (collectively "NPB"); Nankai Seiko Co., Ltd. ("SMT"); NSK Ltd., NSK Corp., and NSK Precision America, Inc. (collectively "NSK"); and NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp., NTN Driveshaft Inc., and NTN-BCA Corp. (collectively "NTN") challenge the United States Department of Commerce's ("Commerce" or "the Department") findings in Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, 70 Fed. Reg. 54,711 (September 16, 2005) ("Final Results") covering the period of review May 1, 2003, through April 30, 2004.  This court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Because Commerce acted within its discretion, its determinations are sustained.

**II**

**BACKGROUND**

Commerce published in the Federal Register on September 16, 2005, the Final Results of its review of ball bearings and parts thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, covering the period of review from May 1, 2003 through April 30, 2004. Final Results, 70 Fed. Reg. at 54,711.  The scope of this order covers ball bearings (other than tapered roller bearings) and parts thereof, and housed or mounted ball bearings united and parts thereof.  Id. at 54,711-72.  This is the fifteenth review.  The Department calculated weighted-average dumping margin for ball bearings to be 12.78% for Koyo, 7.15% for SMT and 5.93% for NTN. Id. at 54,713.  Commerce issued amended final results for NSK at 8.25% and NPB at 15.51% . Notice of Amended Final Results of Antidumping Duty Administrative Reviews: Ball Bearings and Parts Thereof from Japan, 70 Fed. Reg. 61,252 (October 21, 2005); Notice of Correction to Amended Final Results of Antidumping Duty Administrative Review: Ball Bearings and Parts Thereof from Japan, 70 Fed. Reg. 69,316 (November 15, 2005).

In the fifteenth review, Commerce revised the model-match methodology that it used in the preceding fourteen reviews to determine what sales in the home market are to be compared to sales made in the United States.[1] See Memorandum from Barbara E. Tillman, Acting Deputy Assistant Sec'y for Import Admin., U.S. Dep't of Commerce to Ronald K. Lorentzen, Acting Assistant Sec'y for Import Admin., U.S. Dep't of Commerce ("Issues and Decision Memo") (September 16, 2005) at 19, Gen. R. Doc. 123.  In previous reviews, Commerce determined

---

[1]  Commerce must select similar merchandise in the home market for comparison with merchandise that is sold in the United States when there is no identical merchandise available to use. 19 U.S.C. § 1677(16).  Similarity, according to the statute, is based upon the physical characteristics of the merchandise being compared. Id.

similarity by using a family averaging methodology that compared merchandise using eight different criteria. Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review, 56 Fed. Reg. 31,692 (July 11, 1991).

During the fourteenth administrative review, Timken US Corporation ("Timken") suggested that Commerce modify its method of identifying similar models. Antifriction Bearings and Parts Thereof from France, Germany Italy Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Rescission of Administrative Reviews in Part, and Determination to Resolve Order in Part, 69 Fed. Reg. 55,574 (September 15, 2004). Commerce received comments on the proposal from respondents and issued a memorandum addressing the question of whether a change should be implemented and, if so, when the change should be effective. Memorandum from Jeffrey A. May, Deputy Assistant Sec'y for Import Admin., to James J Jochum, Assistant Sec'y for Import Admin.: Ball Bearings (and Parts Thereof) from France, Germany, Italy, Japan, Singapore, and the United Kingdom—Model Match Methodology, Amended P.R. Doc. 2 (December 3, 2003) ("Model Match Memo"); Letter from Laurie Parkhill to All Interested Parties, Gen. R. Doc. 1, (December 4, 2003).  In the Model Match Memo, Commerce determined that a change in methodology was warranted, but declined to implement a new methodology at that time due to a lack of sufficient data and time to make the changes. Model Match Memo at 5-8.  Upon initiation of the Fifteenth Review, Commerce solicited comments from all interested parties and then informed the parties of its new

methodology.[2] Revised Model Match Methodology, Gen. R. Doc. 33 (July 7, 2004) ("Revised

Model Match").  Parties Koyo, NPB, NTN, Timken, NSK, and SMT challenged the outcome of

varying aspects of the Fifteenth Review in Court Numbers 05-00560, 05-00565, 05-00566, 05-

00572, 05-00573, and 05-00574.[3]  On January 23, 2006 these numbers were consolidated under

Court Number 05-00560.  Oral argument was held on January 24, 2007.

**III**
**STANDARD OF REVIEW**

This court will sustain an agency's findings, conclusions, or determinations unless they

are "unsupported by substantial evidence on the record, or otherwise not in accordance with

law." 19 U.S.C. § 1516a(b)(1)(B); see Magnesium Corp. of Am. v. United States, 166 F.3d 1364,

1368 (Fed. Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S.

474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  Courts have deemed substantial evidence to be

something less than the "weight of the evidence;" the possibility of drawing two inconsistent

---

[2]  Under the new methodology, Commerce continues to use the eight characteristics used in the previous fourteen administrative reviews, but require that only four of the criteria (load direction, bearing design, number of rows of rolling elements, and precision rating) match exactly, whereas the family averaging methodology required a match in all 8 categories. Revised Model Match at 6-8.  If a match in one of those four criteria was not found, Commerce would then resort to constructed value for the normal value. Id.

[3]  In their briefs, Plaintiffs Koyo abandon their claims in counts two and four of their complaint and Plaintiffs NSK abandon their claims in counts one and four of their complaint. Memorandum of Points and Authorities in Support of Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. for Judgment on the Agency Record ("Koyo's Brief") at 6; Memorandum of Points and Authorities in Support of NSK's Motion for Judgment on the Agency Record ("NSK's Brief") at 1.

conclusions from presented evidence will not necessarily prevent an agency's finding from being supported by substantial evidence.  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citing Labor Board v. Nevada Consol. Copper Corp., 316 U.S. 105, 106, 62 S. Ct. 960, 86 L. Ed. 1305 (1942); Keele Hair & Scalp Specialists, Inc. v. FTC, 275 F.2d 18, 21 (5th Cir. 1960)).

When evaluating Commerce's statutory interpretation the court uses a two step analysis, first examining whether Congress has "directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  If this is the case, courts then must "give effect to the unambiguously expressed intent of Congress." Id. at 842-43; see Household Credit Servs. v. Pfennig, 541 U.S. 232, 239 124 S. Ct. 1741, 158 L. Ed. 2d 450 (2004).  If instead Congress has left a "gap" for Commerce to fill, the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44.  Additionally, in matters of statutory construction this court will show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965).  The construction need not be the only reasonable one or even the same result this court would have reached had it arisen in a judicial proceeding in order to be sufficient to sustain an agency's interpretation. Id. (citing Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)).

**IV**

**DISCUSSION**

**A**

**Commerce's New Model Match Methodology is Supported by Substantial Record Evidence and is in Accordance with Law**

**1**

**Commerce was Reasonable in Concluding that Compelling Reasons Existed to Change the Model-Match Methodology**

Plaintiffs argue that Commerce did not demonstrate a compelling reason to revise its model match methodology. Memorandum of Points and Authorities in Support of Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. for Judgment on the Agency Record ("Koyo's Brief") at 11-16; Plaintiff Nankai Seiko, Co., Ltd.'s Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record ("SMT's Brief") at 13;[4] Memorandum of Points and Authorities in Support of the Motion for Judgment Upon the Agency Record Submitted by Plaintiffs Nippon Pillow Block Co., Ltd. and FYH Bearing Units USA, Inc. ("NPB's Brief") at 8-16; Memorandum of Points and Authorities in Support of NSK's Motion for Judgment on the Agency Record ("NSK's Brief") at 11-16; Rule 56.2 Motion and Memorandum for Judgment on the Agency Record Submitted on Behalf of Plaintiffs NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation ("NTN's Brief") at 13-17. According to Koyo, NPB, NSK, and NTN, Commerce only assumes that the matches generated under the revised methodology will create more accurate matches, but provides no

---

[4] SMT does not address the compelling reason issue in its memorandum in support of its Motion, but concurs with the views of the other Plaintiffs and incorporates their arguments by reference into its brief.

record evidence of this. Koyo's Brief at 17; NPB's Brief at 13; NSK's Brief at 13.  NSK argues that achieving more price-to-price comparisons does not necessarily equate with a more accurate dumping margin. NSK's Brief at 15.  Additionally, it says, the increased complexity of the revised method "results in more selective use of reported sales data, more erratic matches of U.S. and home market sales, and a built-in bias for higher margins," which, according to Koyo, reduce the representativeness and accuracy of dumping margins. Koyo's Brief at 24.  Koyo, NPB, and NTN also claim that Commerce's justification of technological advances allowing the new methodology is misplaced because there is no evidence that the family averaging methodology was adopted because of perceived technical limitations; rather the stated purpose of the methodology was to take into account the "salient characteristics of the AFB market." Koyo at 25 (quoting Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order; In the matter of A-27-801, A-428-801, A-475-801, A-588-804, A-485-801, A-559-801, A-401-801, A-549-801, A-412-801; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom, 58 Fed. Reg. 39,729, 39,763 (July 26, 1993)); NPB at 12; NTN at 11.  NTN further argues that the family method lends stability and predictability, and thus should be retained.  NTN's Brief at 17-18.

Defendant counters that it has the discretion to develop a methodology that will determine what is "like" or "similar" merchandise under the controlling statute, 19 U.S.C. § 1677.[5]

---

[5] Arguments of Defendant-Intervenor Timken in its Response Brief follow those of Defendant United States unless otherwise noted. See Response of Timken US Corporation to the Rule 56.2 Motions of Koyo Seiko Co., Ltd., et al., Nankai Seiko Co., Ltd. (SMT), et al., Nippon Pillow Block Co., Ltd. (NPB), et al., NSK Corp. et al., and NTN Corporation, et al. ("Timken's Brief").

Defendant's Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency

Record ("Defendant's Brief") at 36.  Further, Commerce argues that according to the court, it

may alter its methodology as long as the new methodology is reasonable, citing  Hangzhou

Spring Washer Co., Ltd. v. United States, 387 F. Supp. 2d 1236, 1246 (CIT 2005), and offers

three reasons as to why its determination that there were compelling reasons to revise the

methodology is supported by substantial evidence. Id. at 38-39.  First, Defendant contends that

the revised methodology is a more accurate reflection of the intent of 19 U.S.C. § 1677(16)(B)

because it compares "foreign like products to the single most similar model," which more

accurately implements the statute by "including those models that 'are like subject merchandise

in component material(s) and in the purposes for which used.'" Id. at 39 (quoting 19 U.S.C. §

1677(16)(B)(ii)).  Second, the revised methodology's use of the single most similar model

satisfies the statutory preference for price-to-price comparisons. Id.  Third, technological

advancements now allow Commerce to implement a more accurate methodology. Id.

Foreign like products are addressed in 19 U.S.C. § 1677(16), which reads, in pertinent

part,

> (B) Merchandise--
>      (i) produced in the same country and by the same person as the subject
> merchandise,
>      (ii) like that merchandise in component material or materials and in the
> purposes for which used, and
>      (iii) approximately equal in commercial value to that merchandise.

19 U.S.C § 1677(16)(B).  In determining what is "like" merchandise, Commerce is given broad

discretionary power to create a methodology that best achieves the statutory goal. Torrington Co.

v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995).  Commerce created the family averaging

methodology pursuant to this discretion, and its decision that there are compelling reasons to
revise that methodology must have a reasonable basis to be upheld. Hangzhou Spring Washer
Co., 387 F. Supp. 2d at 1246.

According to Timken Co. v. United States, 10 CIT 86, 96-97, 630 F. Supp. 1327 (1986),
the preference of the statute is to compare foreign like products to a single most similar model
from the U.S.  There the court determined:

> if values can be found only for items of "similar" merchandise, the value of the
> item most similar to that under appraisement should be adopted. Moreover, an
> interpretation of the statute requiring selection of the most similar merchandise is
> most likely to ensure that the ITA "makes the fair value comparison on a fair basis
> -- comparing apples with apples."

Timken, 10 CIT at 96-97 (quoting Smith-Corona Group v. United States, 713 F.2d 1568, 1578
(Fed. Cir. 1983)).  Thus, as Defendant argues, the single most similar method most recently
adopted by Commerce more accurately implements the statutory preference of selecting the most
similar merchandise to compare than the family method, which used an averaging technique to
create the comparison.  Under the new methodology Commerce is able to capture slight
differences in models that will potentially be more similar than those matching exactly on the
eight basic characteristics the family method uses but which contain significant differences in
other areas. Issues and Decision Memo at 24.

In addition, selection of the single most similar methodology also allows for a greater
number of reasonable price-to-price comparisons, as is the statutory preference. See 19 U.S.C. §
1677b(a)(1)(A) ("The normal value of the subject merchandise shall be the price described in
subparagraph (B) . . . .").  Plaintiffs are incorrect in their assertion that there is no such
preference. See Uruguay Round Agreement Act Statement of Administrative Action ("SAA"),

H.R. Doc. No. 103-316 at 820 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4161 ("[T]he

preferred method for identifying and measuring dumping is to compare home market sales of the

foreign like product to export sales to the United States.").   Under the family methodology

Commerce used constructed value for two-thirds of all models lacking contemporaneous sales of

the identical model, whereas under the new methodology price-to-price comparisons rose from

thirty to seventy percent. Memorandum from Barbara E. Tillman, Acting Deputy Assistant Sec'y

for Import Admin., Dep't Commerce, to Joseph A. Spetrini, Acting Assistant Sec'y for Import

Admin., Dep't Commerce, at 6-7, 14 (May 6, 2005).

     Finally, the recent technological advances cited by Commerce act as the means to the end

of achieving more accurate margins, making the timing of the revision all the more reasonable.

During Oral Argument, counsel for Defendant, citing Hangzhou Spring Washer Co., 387 F.

Supp. 2d at 1236, commented that the changes made to the methodology meet the reasonableness

standard applied to Commerce by the courts because the change lightens the administrative

burden and continues to meet the statutory preference of maximizing price to price comparisons.

This assessment is an accurate reflection of the Government's burden, which has been adequately

addressed by Commerce's explanation of its decision.

     As Defendant-Intervenor Timken aptly notes, prior restraints no longer apply, and

Commerce can now use a method that increases accuracy by enhancing data collection and

control and addressing prior flaws, and that is more consistent with statutory preference. See

Timken's Brief at 18.  This constitutes a compelling reason to change the methodology.  In light

of these considerations, substantial evidence exists to show that Commerce was reasonable in

determining that there were compelling reasons to revise its methodology, and thus the new

11

methodology is sustained.

**2**
**Commerce Provided Adequate Notice of the Change, and it was Properly**
**Applied to this Review**

Plaintiffs argue that they were not given sufficient notice of the change in methodology

and thus the application was unlawfully retroactive. Koyo's Brief at 31; NSK's Brief at 19;

NPB's Brief at 16; NTN's Brief at 18-20.  NSK argues that because the methodology was not

defined until May 2005, NSK was unable to price its U.S. sales at or above normal value. NSK's

Brief at 19.  According to NSK, the family averaging methodology carried the weight of law due

to its status as a longstanding agency practice, and all changes had to be made prospectively,

even when Commerce had the discretion to revise the method. NSK's Brief at 21.  NSK points to

an increase in its dumping margin in this review that is over three times greater than that in the

thirteenth and fourteenth reviews to show that it did, in fact, rely upon the family methodology,

and asserts that this is also due to the fact that the sales activity associated with the fifteenth

review period took place before the change was made. NSK's Brief at 23.

Similarly, NPB argues that it detrimentally relied on the Department's use of the family

averaging methodology; the retroactive change precluded it from amending its pricing activities

to account for the new methodology, thereby minimizing the number of sales at or above normal

value. NPB's Brief at 16-17. NPB also notes that there is no evidence on the record of any

significant error in the implementation or administration of the family method. Id. at 18.

Koyo adds that it was impossible for it or any other respondent to eliminate dumping

margins by any of the Department's accepted methods when Commerce retroactively applies the

methodology to sales that have already occurred. Koyo's Brief at 33.  This, it says, results in an

inflation in the dumping margins, but fails to address the remedial goal of antidumping margins. Id. at 32-33.

Defendant argues that the notice given to the parties was sufficient. Defendant's Brief at 47. It notes that Commerce is permitted to change its methodology as long as notice and opportunity to comment are given before the final determination. Id. at 48 (citing 19 U.S.C. § 1677m(g)). As Commerce afforded the parties an opportunity to comment before the final determination, Defendant claims that it satisfied its statutory obligation. Id. Defendant further argues that it gave sufficient notice with regard to the "cap" for the sum of the deviations and precision grade. Id. at 49. It notes that though parties were not given notice before the preliminary results of review, they were given notice that the issues were under consideration and were also invited to submit comments. Id. (citing Letter from Mark Ross to All Interested Parties, Invitation for Comment on Precision Grade, Gen. R. Doc. 23 (June 22, 2004); Letter from Jeffrey A. May, Deputy Assistant Sec'y for Import Admin. to James J. Jochum, Assistant Sec'y for Import Admin., Antifriction Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Model Matching Methodology, Gen R. Doc. 42 (September 2, 2004); Letter from Mark Ross to All Interested Parties, Invitation for Comment on Cap on Product Specification Deviation, Gen. R. Doc. 57 (October 29, 2004)). According to Commerce, the increase in similar matches and matches to most similar models "compels this change." Id.

Additionally, Defendant argues that changes in methodology "permissibly involve retroactive effect to the extent that this change affected entries made during the period of review subject to Commerce's final determination." Id. at 50. To apply them only to future entries would, according to Defendant, "stymie Commerce's ability to change its own practices." Id.

Commerce believes that a limitation to prospective application would directly contravene the statute. Id.

In order to change its methodology, Commerce must provide the affected parties with notice and the opportunity to comment before the final determination is made. 19 U.S.C. § 1677m(g); Shikoku Chems. Corp. v. United States, 16 CIT 382, 388-89, 795 F. Supp. 417 (1992) (finding that principles of fairness can prevent Commerce from changing its methodology without adequate notice).   In this case, Commerce revised its methodology only after providing the parties with notice and meaningful opportunity to comment on the change, even extending the period for further commentary. Letter from Laurie Parkhill, Director, Dep't of Commerce, to All Interested Parties (December 4, 2003), Gen. R. Doc. 1.  Though Plaintiffs argue that the change was unfair because Commerce failed to notify them before the end of the review period, Commerce was only obligated to notify them before the final determination. 19 U.S.C. § 1677m(g); see Shikoku Chems. Corp., 16 CIT at 388-89.  Commerce did this, and therefore the notice given to the parties was adequate.

Plaintiffs' contention that the application of the methodology was unlawfully retroactive is similarly flawed.  Changes in methodology, like all other antidumping review determinations, permissibly involve retroactive effect. 19 U.S.C. § 1675(a)(2); see Am. Permac, Inc. v. United States, 10 CIT 535, 539, 642 F. Supp. 1187 (1986) ("19 U.S.C. § 1675(a)(2) expressly calls for the retrospective application of antidumping review determinations").  Applying these changes prospectively would hinder Commerce's ability change its own practices and directly undermine the statutory preference for retrospective application of antidumping review determinations. 19 U.S.C. § 1675(a)(2).

Additionally, Plaintiff NSK makes the argument that the preexisting methodology qualifies as a "longstanding practice." Because longstanding practices by Commerce carry the weight of law, NSK concludes the practice can only be substituted prospectively.  NSK's Brief at 20-21; NSK's Reply at 9.  Timken counters in its response that this argument should be rejected because Commerce has applied different methodologies in different cases, and so there is no longstanding practice. Timken's Brief at 21-22.  In its reply, NSK argues that "Timken does not clarify why an agency cannot have different longstanding practices in different cases, and it does not cite any cases supporting its position."  NSK's Reply at 10.

According to case law, "Commerce is required to follow prior 'precedent' only if it represents a settled rule applied consistently over time." Bethlehem Steel Corp. v. United States, 25 CIT 895, 914 n.37, 159 F. Supp. 2d 730 (2001).  While there is "no explicit explanation . . . of what is required to establish a prior norm . . . [t]he word 'norm' connotes consistency over time." Coalition for Fair Atl. Salmon Trade v. United States, 24 CIT 263, 266, 101 F. Supp. 2d 821 (2000) (citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S. Ct. 2367, 37 L. Ed. 2d 350 (1973) (using "settled rule" in relation to prior norm); Hussey Copper, Ltd. v. United States, 17 CIT 993, 997-98, 834 F. Supp. 413 (1999) (using "traditional methodology" and "normal practice" in relation to prior norm)).  As consistency is required to achieve the status of longstanding practice, and the existence of two opposing practices in this case show an inconsistency in Commerce's behavior, there is therefore no longstanding practice to consider.[6]

---

[6]  Plaintiffs also argue that their expectation that Commerce would continue to use the same methodology caused them to detrimentally rely on the practice. See, e.g., NPB's Brief at 16-17 (citing Shikoku, 16 CIT at 388-89).  Detrimental reliance is one element of the longstanding practice argument addressed above.  As this case fails to meet the standard of a

**3**
**The Resulting Similar Matches are Supported by Substantial Record Evidence and are in Accordance with Law**

Plaintiffs Koyo and NBP each argue through specific examples that the Department's new methodology led to the comparison of dissimilar bearing products. Koyo's Brief at 27; NPB's Brief at 18.  Plaintiffs argue that the Department "ignored key physical characteristics necessary to differentiate different bearings and to identify foreign like products for comparison," thus erroneously comparing certain specialty bearings with unrelated or standard bearings. NPB's Brief at 18; see Koyo's Brief at 28-29.  NPB contends that the eight physical characteristics[7] used in the single most similar model method are not enough to select foreign like products; it argues that Commerce must also consider additional criteria such as "type of seals, balls, and the ring width." NBP's Brief at 19-20.  NPB provides several examples, such as comparing high temperature bearings and dust proof bearings to standard models. Id. at 21.  It attempted to raise these arguments to Commerce, but they were rejected. Id. at 23.

Koyo begins its examples of mismatches with Match 3 from Exhibit D of its case brief, where the methodology resulted in a dumping margin based on a customized U.S. bearing used in the [ certain application ] compared to the Japanese price of a bearing used in [ a different application ]. Koyo's Brief at 27-28.  The U.S. model was custom designed with [ certain

---

longstanding practice, the Plaintiffs' reliance is not enough to require a prospective application of the change.

[7]  (1) bearing load, load direction, number of rows, and precision grade match exactly; (2) from those models, the four physical characteristics of width, inner diameter, outer diameter, width and load rating match with a total sum of the deviations in physical characteristics not greater than 40 percent. Issues and Decision Memo at 19.

physical characteristics ] while the Japanese model was not. Id. at 28.  Its other examples have similar distinctions.[8]  According to Koyo, there are "virtually no similarities between the physical characteristics or commercial uses" of these products. Id.  Koyo argues that the introduction of matches such as these is evidence that the new methodology has actually decreased the accuracy of Commerce's antidumping calculation. Id. at 29.

Defendant counters that the statute does not require the level of substitutability or similarity urged by Plaintiffs; home market models need not be technically substitutable, purchased by the same customers, or given the same end use as the U.S. model. Defendant's Brief at 52 (citing Koyo Seiko Ltd. v. United States, 66 F.3d 1204, 1210 (Fed. Cir. 1995)). Plaintiffs' focus on specific examples ignores that all of the products meet the basic eight similar matching characteristics, which are the same as the characteristics used in the family averaging methodology. Id. at 52-53.

Defendant also contends that while Koyo points out examples of specifically mismatched merchandise, it does not assert whether a better match exists for those examples. Id. at 55. Additionally, according to Commerce, Plaintiffs fail to establish the need for additional criteria beyond the eight basic criteria used by Commerce for fifteen years. Id. at 56.  First, the addition of design sub-types within the "bearing design" criterion is wholly unlike adding new criteria beyond the basic eight, according to Defendant. Id.  Second, Defendant notes that Koyo stated that no additional criteria should be added when Commerce solicited comments on the

---

[8]  Match 7 from Koyo's Exhibit D compared sales of a U.S. model used in [ a certain application ] with a home market bearing used in [ a different application ]. Id.  Match 8 compared a U.S. model used in [ a certain application ], to a Japanese model used in [ a different application ]. Id.

development of a new model match methodology, and NPB submitted no comments on the matter. Id. at 57 (citing Letter from Sidley Austin Brown & Wood LLP to Donald L. Evans, Sec'y of Commerce, Koyo's Comments on Model-Methodology, Gen. R. 12, at 18.)  Finally, Defendant asserts in response to NPB's argument that it improperly rejected new factual information that "the proprietary cost data upon which it sought to rely was not submitted upon the record of the fifteenth administrative review," and thus, as it was not on the record, was properly rejected. Id. at 59.

Under the Antidumping statute, similar merchandise, or "foreign like products," are:

(i) produced in the same country and by the same person as the subject merchandise,
(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.

19 U.S.C. § 1677(16)(B)(i)-(iii).[9]  According to the Court of Appeals for the Federal Circuit, "for purposes of calculating antidumping duties, it is not necessary "'to ensure that home market models are technically substitutable, purchased by the same type of customers, or applied to the same end use as the U.S. model. . . . Matching 'such or similar' home-market merchandise with certain U.S. merchandise is all that the statute requires.'" Koyo Seiko, 66 F.3d at 1210 (Fed. Cir. 1995) (quoting Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof From Japan, Final Results of Antidumping Duty Administration Review, 56 Fed. Reg. 41,511 (August 21, 1991)).

In this case, Commerce's matches achieve the level of similarity required by the statute.

---

[9]  The first criterion is not at issue here.

First, Commerce goes beyond its general matching methodology, requiring that matches meet the eight basic similar matching characteristics[10] along with a stricter forty percent sum of the deviations cap of allowable differences between inner and outer diameter, width, and load rating imposed for the bearings methodology. Issues and Decision Memo at 19.  In addition, any differences are accounted for by a difference in merchandise ("DIFMER") adjustment.  Plaintiffs fail to provide an example of better matches for those they identify as mismatched, and additionally fail to recognize that the statute does not require Commerce to find identical or substitutable matches, but rather "similar" ones.  With the forty percent sum of the deviations test and the twenty percent DIFMER adjustment, Defendant asserts "if there were any sales of a home-market product with more similar physical characteristics to the United States sales in question, Commerce would have used them." Defendant's Brief at 55.  Plaintiffs do not identify any such sales, and Commerce has fulfilled its duty under the statute to sustain its findings of similar matches.

**4**

**Commerce's Ordering of Criteria for the Most Similar Home Market Sale is Supported by Substantial Record Evidence and is in Accordance with Law**

Plaintiff SMT argues that Commerce's decision to use level of trade and contemporaneity to choose between equally similar models rather than differences in variable cost of manufacture is not supported by substantial evidence. SMT's Brief at 15.  First, SMT contends that Commerce failed to articulate a reason for changing its tie-breaker methodology, and alleges that is grounds in and of itself to remand to the agency for further explanation. Id. (citing Hontex

---

[10]  These eight basic critera are the same used in the prior family average methodology that Plaintiffs argue should be reinstated.

Enterprises, Inc. v. United States, 248 F. Supp. 2d 1323, 1344 (CIT 2003) (finding that the court could not uphold Commerce's interpretation of the antidumping statute without knowing what factors led to the decision)).  SMT then argues that Commerce's use of level of trade and contemporaneity instead of cost differences was not in accordance with agency practice and yielded distortions in the margin calculation as it was applied to SMT. Id. at 17.  According to SMT, Commerce relied on incorrect statutory provisions[11] to conclude that normal value should be based on prices at the same level of trade and violated its established practice of using DIFMER as the tie-breaker for identifying similar merchandise.  Id. at 18, 22.  This misapplication of the tie-breaker, SMT says, seriously distorted its product comparisons, resulting in matches of U.S. market sales to home market sales with higher cost difference percentages than would have occurred if DIFMER had been used, and the court therefore should remand to Commerce to re-conduct the model match methodology using DIFMER as its primary means of selecting among equally similar models. Id. at 27-30.  SMT adds that Commerce's definition of "contemporaneous" is an unreasonable interpretation of the governing statute, and it should be only selecting sales that, if not occurring in the same period of time, then as close to the same period of time as possible. Id. at 32.

---

[11] "Commerce recites section 773(a)(1)(B)(i) of the Act, 19 U.S.C. § 1677b(a)(1)(B)(i), for the proposition that normal value shall be based on prices 'to the extent practicable, at the same level of trade,' and section 773(a)(1)(A) of the Act, 19 U.S.C. § 1677b(a)(1)(A), for the proposition that normal value shall be based on prices 'at a time reasonably corresponding to the time' of the U.S. sale. . . . However, [these citations] are irrelevant to the selection between product models.  Sections 773(a)(1)(A) and (B) relate to the characteristics of the sales transactions, not to the physical characteristics or market value of the products themselves." Id. at 18.

Defendant counters that there is no legal basis for requiring Commerce to apply a smallest DIFMER test in identifying sales of similar merchandise. Defendant's Brief at 60.  Additionally, Defendant argues that SMT fails to establish that Commerce's identification of sales of similar merchandise is distortive. Id. at 65.  "[I]t is not necessary, as SMT argues, to narrow further the pool of similar sales based upon the smallest difference in cost because all of the sales in the pool of similar sales have already passed the smallest sum-of-the-deviations test for the eight similar model-match characteristics, the 40 percent sum-of-the-deviations test and the 20 percent DIFMER test." Id. at 66.  Commerce adds that applying the smallest DIFMER test would result in a narrow finding, contravening one of the purposes of the revision: to generate more matches. Id.

Defendant also contends that it did provide a reasonable explanation for its methodology, but denies SMT's assertion that using the smallest DIFMER is a longstanding practice. According to Defendant, though Commerce applied a smallest DIFMER test in several instances, "in none of these determinations did Commerce articulate a policy in this regard or establish a set hierarchy for analysis." Id. at 67.  The modification, it says, was made to reflect the data sampling situation, and is consistent with 19 C.F.R. § 351.414(e)(2). Id. at 70.

The controlling statute here is 19 U.S.C. § 1677(16)(B), which provides the statutory definition of similar merchandise.  Nowhere in the statute or accompanying regulations is there a requirement that Commerce follow a specific hierarchy when determining what is "similar" for purposes of comparison; rather Commerce is left with broad discretion to develop its own methodology for this, Torrington Co. v. United States, 19 CIT 403, 414, 881 F. Supp. 622 (1995).  Though Commerce has in the past applied a DIFMER test before applying a level of

trade and contemporaneity test, it is nowhere required that it do so. See CEMEX, S.A. v. United States, 133 F.3d 897, 899-900 (Fed. Cir. 1998) (applying a DIFMER test first).

As Commerce explains, requiring that it apply the smallest DIFMER test first will result in a narrow finding of home market sales that works against the purpose of the methodology's revision. The additional narrowing is simply not needed as all of the matches SMT protests had the smallest sum of deviations for the eight basic characteristics, passed the forty percent sum of deviations test, and passed the twenty percent DIFMER test. Those that resulted in higher DIFMERs than other less contemporaneous sales likewise had higher DIFMER adjustments to normal value, thus taking into account any distortions. The hierarchy Commerce has chosen therefore is a reasonable interpretation of the statutory requirements, is in accordance with law, and should be sustained.

**5**
**Commerce's rejection of NTN's request to differentiate its bearings was proper**

Plaintiff NTN argues that Commerce improperly rejected NTN's proposed design types, leading to unreasonable matches between substantially different designs. NTN's Brief at 21. This decision, according to NTN, ignores record evidence that shows significant differences in the design types and led to Commerce matching physically and functionally different products. Id. at 22. Additionally, NTN says that though Commerce determined that NTN did not provide adequate justification to use its reported bearing designs, NTN provided the agency with "numerous examples of the unreasonable matches that resulted from the use of Commerce's rather than NTN's design types." Id. at 24. NTN also argues that it relied on the longstanding use by Commerce of its design types. Id. at 27.

Defendant counters that NTN fails to establish that the differences it identifies are so severe that the DIFMER adjustment cannot account for them. Defendant's Brief at 75.  In addition, Defendant says that NTN does not dispute that it failed to provide the necessary information and explanation as to why Commerce should adopt the design type designations it identifies. Id. at 77.  According to Defendant, the examples provided by NTN give only differences in physical characteristics, which alone is insufficient to justify the addition of different design types. Id.  Defendant also argues that Commerce's action in accepting two additional design types NTN previously reported was not inconsistent with this decision because in this review NTN has not provided any justification for accepting its suggested design types. Id. at 78.  Finally, Defendant adds that implementation would be impractical in this review because of NTN's failure to alert or provide justification to Commerce of its proposed subtypes in its questionnaire response. Id. at 79.

As above, the controlling statute is 19 U.S.C. § 1677(16)(B), and Commerce has the discretion to develop its own methodology for determining what constitutes "like" or "similar" merchandise. Torrington, 19 CIT at 414.  Bearing design is one of the eight basic characteristics that Commerce has chosen to rely upon when choosing among similar merchandise for comparison. Issues and Decision Memo, at 19.

In its supplemental questionnaire, Commerce specifically requested a detailed explanation of why it should use different bearing design types than those set forth in the original questionnaire. NTN Supplemental Questionnaire, Pub. Doc. 217/11487, question 15 (March 14, 2005).  In its Issues and Decision Memorandum, Commerce explained that it could not justify using all of the design types proposed by NTN because "NTN did not provide a detailed analysis

23

of its bearing-design types and did not explain the differences among its various designations."

Issues and Decision Memo, at 57.  Additionally, NTN failed to report its bearings based on the

original basic design types as Commerce requested, and instead reported bearings on the basis of

its own suggested design types.  When Commerce questioned NTN, its explanation for the

suggested design types did not include an explanation as to why the differences could not be

accounted for with a DIFMER adjustment. NTN Supplemental Questionnaire at 10.  As each of

Commerce's determinations to accept additional design types must be based on substantial

record evidence in that particular review, 19 U.S.C § 1516a(b)(1)(B)(i),[12] Commerce was

reasonable in rejecting these design types even if it had accepted them as sufficiently justified in

the past.

　　　For the reasons stated above in Section A, Subsections 1-5, Commerce's decision to

change its model match methodology in this review and the resulting new methodology are

supported by substantial record evidence and are in accordance with law.

**B**
**Commerce's rejection of NTN's Proposed Adjustments to its Indirect Selling Expenses is Supported by Substantial Record Evidence**

　　　In its initial questionnaire, Commerce requested that NTN provide a description of all of

its selling expenses in the United States, including indirect selling expenses. Memorandum from

Donald J. Unger, Barnes Richardson & Colburn to Donald L. Evans, Sec'y of Commerce,

---

[12]  (1) Remedy. The court shall hold unlawful any determination, finding, or conclusion
found . . .

　　　　　(B)(i) in an action brought under paragraph (2) of subsection (a), to be
　　　　　unsupported by substantial evidence on the record, or otherwise not in accordance
　　　　　with law . . . .

(January 13, 2005) ("NTN's Section C Questionnaire"), at C-37, C-41.  In its response NTN

provided a sum to exclude from [ certain selling expenses ] and sought to exclude from indirect

selling expenses [ certain management expenses ]. Id. at Exch. C-11.  In a supplemental

questionnaire, Commerce requested that NTN justify these proposed adjustments. Memorandum

from Donald J. Unger, Barnes, Richardson & Colburn to Carlos M. Guiterrez, Sec'y of

Commerce (March 14, 2005) ("NTN's Second Supplemental Questionnaire Response") C.R.

Doc. 73.  In its Preliminary Results, Commerce rejected NTN's proposed adjustment for [ certain

selling expenses ], but accepted its methodology for allocation of [ certain management

expenses ]. Antifriction Bearings and Parts Thereof from France, Germany, Italy, Japan,

Singapore, and the United Kingdom: Preliminary Results and Partial Rescission of Antidumping

Duty Administrative Reviews, 70 Fed. Reg. 25,539 (May 13, 2005) ("Preliminary Results").

Then, in the Final Results, while Commerce maintained its rejection of [ certain selling

expenses ] it also denied the adjustment for [ certain management expenses ].  Issues and

Decision Memo, cmt. 23, 24.

NTN argues that Commerce's recalculation of NTN's indirect selling expenses should

not be upheld because Commerce did not exclude expenses that, according to NTN, were related

exclusively to non-subject merchandise. NTN's Brief at 27.  Though Commerce asserted that

NTN did not explain its calculation of warehousing expenses related to the sale of [ a related

company's ] products, NTN contends that it twice explained that these expenses were solely

related to non-subject merchandise, and [ the related company ] does not produce any

merchandise that is subject to the antidumping duty order at issue in this case. Id. at 28.  On the

subject of [ certain management expenses ], NTN argues that Commerce's allocation, based

entirely on annual sales, "is not appropriate because these expenses are not incurred on sales value, and do not vary with the amount of sales at each company." Id. at 31.

Defendant counters that NTN failed to adequately justify its lump sum adjustments for [ certain selling expenses ] because it did not explain its calculations despite repeated requests by Commerce to do so, and thus they were properly rejected. Defendant's Brief at 98-101. According to Defendant, a general description of the nature of the expenses is insufficient without an explanation of how the amount to be deducted was calculated by NTN. Id. at 102. When addressing [ certain management expenses ], Defendant notes that Commerce denied NTN's proposed adjustment in the Final Results because the allocation methodology "did not rationally reflect a division between subject and non-subject merchandise." Id. at 104.  NTN, Commerce says, did not satisfy its burden of showing that its allocation method is reasonable and without distortion because it did not track the time spent by [ the manager ] between each company, rendering its allocation arbitrary and "not calculated upon as specific a basis as is feasible." Id. at 107.  Defendant also asserts that Commerce's decision to reject NTN's adjustments comports with its past practice and its reasoning was adequately explained. Id. at 108, 109.

Though Commerce will allow suggestions for allocation methodologies that differ from its own general practice, the burden is on the requesting party to establish that its alternative is reasonable and will not create distortions. 19 C.F.R. § 351.401(b)(1) ("In making adjustments to export price, constructed export price . . . [t]he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment").  Pursuant to 19 C.F.R. § 351.401(g)(2):

26

> Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

Thus, "[i]f Commerce is not satisfied, then it has the discretion to reject the allocations and adjustments sought by the interested party." NTN Corp. v. United States, 306 F. Supp. 2d 1319, 1328 (CIT 2004); see 19 C.F.R. § 351.401(g)(1) (stating that the agency must be "satisfied that the allocation method used does not cause inaccuracies or distortions.").

In the case of [ certain selling expenses ], NTN did not provide an explanation or even answer the specific inquiries made by Commerce into the reasoning behind its calculations.[13] NTN Supplemental Questionnaire Response at 24-26 (NTN's Brief, Appendix 10). As the record contains no explanation of the basis for NTN's calculation, NTN did not meet its burden of establishing that the allocation is reasonable. Commerce therefore was within its discretion to determine that there was insufficient support for the proposed adjustments, and to reject NTN's allocations.

For the [ certain management expenses ], Commerce was similarly within its discretion when it chose to reject NTN's proposal. NTN did not satisfy its burden of showing that its allocation method did not cause inaccuracies or distortions. As Defendant notes, NTN did not track the time [ a certain manager ] spent at each company. This renders Commerce's determination that it produced unreasonable inaccuracies or distortions within the discretion given Commerce by the regulation.

---

[13] Commerce asked NTN: "Who does NBCA pay for the expenses that you excluded from G&A?" to which NTN never responded. NTN Supplemental Questionnaire Response at 26, Q 128.

**C**

**Commerce's Determination to Deduct Certain Additional Benefits Expenses from the Constructed Export Price ("CEP") is Supported by Substantial Record Evidence and is in Accordance with Law**

Plaintiff NSK argues that its Japanese worker expenses have no connection with its economic activities in the United States. NSK's Brief at 24.  According to NSK, though the base salary for workers is related to activity in the United States, the additional benefits in question are not. Id. at 25.  As [ a company ] pays the employees' base salaries, NSK included the base salary expense in its calculation, but not the additional benefits paid by [ a company ]. Id. at 24-25.

Defendant counters that Commerce's determination to deduct additional benefits from the CEP was in accordance with law because the expenses incurred by NSK were in association with, and as compensation for, its employees engaged in activity in the United States. Defendant's Brief at 83.  According to Defendant, NSK is mistaken when it contends that the additional benefit expenses are not associated with economic activity in the United States because the additional benefits are provided to NSK's employees in Japan. Id. at 84.  Defendant also says that "for purposes of calculating CEP, there is no difference between the 'additional benefits' and the salary expenses that NSK acknowledged Commerce properly deducted from CEP." Id.  Finally, Defendant asserts that NSK's argument that [ a company ] paid the additional benefits expenses is irrelevant, as the regulation provides that CEP will be adjusted for economic activity in the United States no matter when or where it is paid. Id. at 85.

Pursuant to 19 U.S.C. § 1677a(b), constructed export price is defined as:

the price at which the subject merchandise is first sold (or agreed to be sold) in the

28

United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

When calculating dumping margins, Commerce will construct a U.S. price for goods that is equivalent to the export price of the home country by deducting certain kinds of expenses from the CEP.[14]  Commerce promulgated the rule in 19 C.F.R. § 351.402(b), which reads:

> (b) Additional adjustments to constructed export price. In establishing constructed export price under section 772(d) of the Act, the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid. The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States, although the Secretary may make an adjustment to normal value for such expenses under section 773(a)(6)(C)(iii) of the Act.

This statutory interpretation by Commerce has been upheld by the court in <u>Timken v. United States</u>, 22 CIT 621, 625, 16 F. Supp 2d 1102 (1998).

As Defendant points out, the fact that the benefits were provided to NSK's Japanese employees in Japan or that the benefits were paid by a different company than that which paid their base salary is not enough to remove the benefits from being considered part of "economic

---

[14]  19 U.S.C. § 1677a(d) provides that, as additional adjustments, CEP may be reduced by:
  (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)--
    (A) commissions for selling the subject merchandise in the United States;
    (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
    (C) any selling expenses that the seller pays on behalf of the purchaser; and
    (D) any selling expenses not deducted under subparagraph (A), (B), or (C).

activity occurring in the United States." Defendant's Brief at 84.  These employees were compensated with additional benefits specifically because they provided services to NSK Corp. that related to its United States sales. Issues and Decision Memo at 55.  In light of this, as Defendant notes in its response brief, when calculating CEP there is no difference between these additional benefits and the base salary that NSK has admitted Commerce properly deducted from the CEP. Defendant's Brief at 84; see 19 C.F.R. § 351.402(b) ("the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid").  Finally, NSK's assertion that the base salary and the additional benefits were paid by separate entities is not sufficient to prevent their deduction from the CEP.  According to the explanation provided in the final rule, "no matter where or when paid," 19 C.F.R. § 351.402(b) is meant to include expenses associated with activities occurring in the United States even when "the foreign parent of the affiliated United States importer pays those expenses." Antidumping Duties: Final Rule, 62 Fed. Reg. 27,296, 27,351 (May 19, 1997).  Thus, as the additional benefits in question were related to economic activity occurring in the United States, Commerce's deduction of those expenses in its calculation of the CEP is supported by substantial record evidence and is in accordance with law.

## D
### Commerce's Zeroing is Supported by Substantial Evidence and is in Accordance with Law

Plaintiffs Koyo, NTN, and NPB each argue that Commerce's practice of "zeroing"[15] negative dumping margins is a violation of U.S. international obligations or contrary to U.S. law.

---

[15] "Zeroing" is the practice of assigning the value of zero to negative margin transactions in the calculation of the weighted average margin.

See Koyo's Brief at 33; NPB's Brief at 25;[16] NTN's Brief at 33.  Koyo and NTN note that the antidumping statute, 19 U.S.C. § 1677b(a) requires that "[i]n determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value."  Koyo's Brief at 34 (quoting 19 U.S.C. § 1677b(a)); see also NTN's Brief at 36.  They go on to argue that Commerce's zeroing practice is not compatible with the requirement of a "fair comparison" as set out by the statute.  Koyo's Brief at 35 (citing SAA at 656; Panel Report, United States–European Communities-Antidumping Duties on Imports of Cotton-Type Bed Linen from India, WT/DS141/AB/R (March 1, 2001) ("Bed Linen"); Panel Report, United States–United States-Sunset Review of Antidumping Duties on Corrosion-Resistant Carbon Steel Flat Products from Japan, WT/DS244/AB/R (December 15, 2003) ("Corrosion-Resistant Steel"); Panel Report, United States–United States-Final Dumping Determination on Softwood Lumber from Canada, WT/DS264/AB/R (August 11, 2004) ("Softwood Lumber").); NTN's Brief at 36-37.  Both Plaintiffs also argue that as the WTO considers the U.S. practice of zeroing to be a violation of the AD Agreement, the United States is not meeting its international obligations if this practice continues.  Koyo's Brief at 35-37, NTN's Brief at 38.

Defendant counters that the arguments Plaintiffs present have been addressed and rejected in previous Federal Circuit opinions.  Defendant's Brief at 113, 115 (citing Corus Staal BV v. United States, 395 F.3d 1343 (Fed. Cir. 2005); Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004)).  Additionally, Defendant argues that the Uruguay Round Agreements Act ("URAA")

---

[16]  In its brief, NPB notes the controlling case law and this court's obligation to follow precedent due to the principle of stare decisis, but raises the argument here in order to preserve its rights to reargue the issue should there be an appeal. NPB's Brief at 26.

makes it clear that the WTO panel and Appellate Body Reports are not able to "change U.S. law or order such a change." Id. at 115 (quoting Corus Staal, 395 F.3d at 1348). Additionally, Defendant notes that reliance on Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 188, 2 L. Ed. 208 (1804) construction is misplaced, as it ignores the principle that a non-self executing agreement is not domestically binding without Congressional implementation. Id. at 119 (citing Defenders of Wildlife v. Hogarth, 330 F.3d 1358, 1362 (Fed. Cir. 2003).

The Court of Appeals for the Federal Circuit has examined the practice in question and addressed the arguments Plaintiffs are making in two separate cases, and each time has found that Commerce's actions are lawful and supported by the language of 19 U.S.C. § 1677. Corus Staal, 395 F.3d at 1346; Timken, 354 F.3d at 1342-45. As Defendant-Intervenor points out, "[t]he issue continues to be whether Commerce, when calculating the weighted average dumping margin, lawfully treated sales where the export price exceeded normal value as sales without a dumping margin (a zero dumping margin) rather than sales with a 'negative' margin." Timken's Brief at 37-38. Plaintiffs thus essentially ignore the obligation of this court to follow precedent as required by stare decisis. See Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Without evidence that new circumstances are present or that the agency has acted in a way that requires a different level of deference, there is no need for this court to revisit the practice of zeroing at this time. See Paul Muller Indus. v. United States, 435 F. Supp. 2d 1241, 1245 (CIT 2006) (holding that zeroing is a legitimate practice as raised in the fourteenth review); NSK Ltd. v. United States, 416 F. Supp. 2d 1334, 1338 (CIT 2006) (sustaining zeroing in the thirteenth review). As Defendant-Intervenor further points out, Plaintiffs' various assertions at best constitute new arguments only, and new arguments do not avoid the weight of precedent.

Timken's Brief at 38; see In re Penn Central Transp. Co., 553 F.2d 12, 15 (3d Cir. 1977) (finding that advancing a new point is not enough to overcome precedent on an issue).

Further, Plaintiffs' arguments that Commerce's practice violates the international obligations of the United States are not persuasive to this court. The Federal Circuit has affirmed zeroing, and until an action by Congress adopts the decisions of the WTO as part of the domestic statutory scheme there is no reason to overturn it. Corus Staal, 395 F.3d at 1347; Timken, 354 F.3d at 1338. No such statutory scheme has been adopted regarding the practice, so there is no reason to reexamine the issue at this time.

**E**
**Commerce's Determination Not to Treat Koyo and its Affiliate as a Single Entity was Proper**

**1**
**Background to Timken's Collapsing Claim**

Commerce sends initial questionnaires to respondents regarding the producers' corporate structure and affiliations, among other issues. In its initial questionnaires to Koyo, Commerce sent several questions regarding Koyo's affiliation with another producer of subject merchandise. In its response, Koyo stated that it was affiliated with one producer and it did buy a significant amount of the affiliate's production. Koyo Section A Questionnaire Response, P.R. Doc. 96 at A-16 to A-17 (October 13, 2004). Koyo also conceded that the affiliate's production facilities produce similar or identical merchandise to its own, but asserted that the companies operate independently and that it cannot direct the operations of the affiliate. Koyo Rebuttal Brief, P.R. Doc. 308 at 5, fr. 11 (June 27, 2005). Commerce accepted this response and made no further inquiry into the relationship, and Timken's comments on Koyo's responses did not reference the

issue. See Petitioner's Comments on Koyo Questionnaire Response, P.R. Doc. 130 (December 7, 2004).

Following Commerce's Preliminary Results Timken contested the treatment of Koyo and its affiliate and argued that they should be treated as a single entity, or "collapsed." Petitioner Case Brief, P.R. Doc. 301. In the Final Results, Commerce concluded that the available record evidence[17] did not support collapsing the two entities, and rejected Timken's request. Issues and Decision Memo, at 46-47.

## 2
## Parties' Arguments

Plaintiff Timken argues that Commerce's decision that no significant potential for the manipulation of price or production existed between Koyo and its affiliate is contrary to the Department's practice. Timken US Corporation's Memorandum in Support of its Rule 56.2 Motion for Judgment on the Agency Record ("Timken's Motion") at 10. Timken points to Koyo's disclosure that the affiliated supplier was [ in a certain relationship with Koyo ], that Koyo purchased [ a certain portion of its ] affiliates' output, and that for the reported sales, the affiliated producer was [ the supplier of a certain portion ] to assert that "intertwined operations" did exist. Id. at 11. According to Timken, Commerce's reliance on Koyo's assertions failed to provide factual explanation, reference objective evidence, or address contrary evidence in the record. Id. (citing Issues and Decision Memo at 47).

---

[17] Commerce added that Timken could have questioned the relationship of the affiliates at an earlier stage in the review if it suspected that their business operations were intertwined, in which case the Department could have obtained more detailed information on the subject. Instead, because Timken waited to express its concern so late in the review, Commerce could only use the evidence available on the record to decide. Issues and Decision Memo at 46-47.

Timken also argues that Commerce's finding that the companies operated independently because Koyo owns less than a majority of the stock "amounts to a non sequitur." Timken's Motion at 13.  According to Timken, both the statute, 19 U.S.C. § 1677(33), and Commerce's regulations make it clear that control can exist in the absence of ownership. Id. at 14-15 (citing 19 C.F.R. § 351.102(b)).  Additionally, Timken contends that Commerce's determination that the companies did not share personnel is unsupported because, though the employees that work for Koyo do not also work for the affiliate, because Koyo receives merchandise produced by the affiliated suppliers and they therefore [ have a certain relationship ]. Id. at 15.

Defendant counters that the record evidence supports Commerce's determination not to collapse the two entries.[18] Defendant's Brief at 90.  The record establishes that Koyo owned less than a majority of stock, only shares officers that are "non-stationed auditors" for the affiliate, and does not share employees, production facilities, sales information or production, or sales or pricing decisions. Id. at 90-91.  Commerce also noted that "given the fact that Timken did not dispute Koyo's representations until it filed its case brief, it was too late for Commerce to obtain more detailed information regarding the relationship," and by the record evidence available concluded that the collapsing was not warranted. Id. at 91 (citing Issues and Decisions Memo at 46-47); see Koyo's Response at 7 ("the Department properly exercised its discretion and found that Timken raised the issue of collapsing Koyo with one of its affiliated suppliers far too late in the administrative review process for the Department to give that issue the timely consideration

---

[18]   Defendant-Intervenor Koyo's arguments in its Response Brief mirror the arguments of Defendant unless otherwise noted.  See Memorandum of Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. in Response to Timken U.S. Corporation's Motion for Judgment on the Agency Record ("Koyo's Response") at 6-17.

that it would require."). Thus, Defendant argues, Commerce appropriately based its decision on the record evidence available. Defendant's Brief at 92.

Timken contends that Commerce's assertion that its collapsing issues was raised at too late a stage in the review is incorrect. Timken's Motion at 15. Though Timken concedes that Commerce could have obtained more detailed information on the relationship of Koyo and its affiliate, Timken contends that this should not prevent Commerce from taking action and measuring the full amount of dumping in order to prevent manipulation. Id. at 15-16.

**3**
**Analysis of Collapsing Claim**

Commerce has promulgated regulations that determine which affiliated parties will be collapsed into a single entity for the purpose of calculating dumping margins in order to avoid the potential manipulation of price or production to circumvent antidumping duties.[19] Thus,

---

[19] 19 C.F.R. § 351.401(f) reads, in pertinent part:

(f) Treatment of affiliated producers in antidumping proceedings. (1) In general. In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

(2) Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:

(i) The level of common ownership;

(ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

(iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

Commerce will treat affiliated producers as a single entity if they have "facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities," and " there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f).  When determining whether there is "significant potential for manipulation," Commerce considers three factors: (1) the level of common ownership, (2) to what extent managerial employees or board members of one firm sit on the board of directors of an affiliated firm, and (3) whether the operations are intertwined through shared sales information, production and pricing decision-making, or significant transactions. Id. These factors are considered by Commerce in light of the totality of the circumstances; no one factor is dispositive in determining whether to collapse the producers. See, e.g., Light Walled Rectangular Pipe and Tube from Turkey: Notice of Final Determination of Sales at Less Than Fair Value, 69 Fed. Reg. 53,675 cmt. 10 (September 2, 2004).  Additionally, Commerce looks for "relatively unusual situations, where the type and degree of relationship is so significant that [it finds] there is a strong possibility of price manipulation." Nihon Cement Co. v. United States, 17 CIT 400, 426-27 (1993) (quoting Final Determination of Sales at Less Than Fair Value: Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, 54 Fed. Reg. 18,992, 19,089 (May 3, 1989)).

 In this case, the evidence on the record supports Commerce's determination not to collapse Koyo and its affiliate into a single entity.  According to the record, Koyo (1) owns less than a majority of the affiliate's stock,[20] (2) the shared officers are merely "non-stationed"

---

[20]  This fact is particularly significant as Koyo explained that, "as a minority shareholder, Koyo has no legal right under Japanese law to compel its affiliate to provide Koyo with its sales and cost data." Issues and Decision Memo, cmt. 6.

auditors for the affiliate, and (3) the companies did not share employees, production facilities, sales information or production, or sales pricing decisions. Koyo Section A Questionnaire Response, P.R. Doc. 96, at A-16 to A-18.  The arguments presented by Timken do not undermine Commerce's determination based on these facts and assessed with the totality of the circumstances surrounding the case.  At best, Timken presents an alternative way to interpret the evidence, and, as the court has noted before, the possibility of drawing two inconsistent conclusions from the record evidence is not enough to render Commerce's decision unsupported by substantial evidence. See Consolo, 383 U.S. at 619-20.  Thus, Commerce appropriately based its determination on the record evidence available to it at the time of the review, and properly declined to collapse Koyo and its affiliate for the purpose of calculating a dumping margin.

## V
## CONCLUSION

For the above stated reasons, Commerce's determination in Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, 70 Fed. Reg. 54,711 (September 16, 2005) is AFFIRMED.


_____/s/ Evan J. Wallach_____
            Evan J. Wallach, Judge

Dated: August 23, 2007
       New York, NY

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |  |
|---|---|---|---|
| _____ | : | | |
| KOYO SEIKO CO., LTD. et al., | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | | |
| | : | Before: | WALLACH, Judge |
| v. | : | Consol. Court No.: | 05-00560 |
| | : | | |
| UNITED STATES, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| TIMKEN US CORPORATION, et al., | : | | |
| | : | | |
| Defendant-Intervenors. | : | | |
| _____ | : | | |

## ORDER AND JUDGMENT

This case having come before the court upon the Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. for Judgment on the Agency Record; Motion for Judgment Upon the Agency Record Submitted by Plaintiffs Nippon Pillow Block Co. Ltd. and FYH Bearing Units USA, Inc.; Plaintiff Nankai Seiko, Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record; Motion for Judgment on the Agency Record submitted on behalf of Plaintiffs NSK Ltd., NSK Corp., and NSK Precision America, Inc.; Rule 56.2 Motion for Judgment on the Agency Record Submitted on Behalf of NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp., NTN Driveshaft Inc., and NTN-BCA Corp.; and Timken US Corporation's  Rule 56.2 Motion for Judgment on the Agency Record (collectively, "Plaintiffs' Motions"); the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; it is hereby

ORDERED ADJUDGED AND DECREED that Plaintiffs' Motions are DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the U.S. Department of Commerce ("Commerce") in Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, 70 Fed. Reg. 54,711 (September 16, 2005), as amended by Notice of Amended Final Results of Antidumping Duty Administrative Reviews: Ball Bearings and Parts Thereof from

<u>Japan</u>, 70 Fed. Reg. 61,252 (October 21, 2005) and <u>Notice of Correction to Amended Final</u>
<u>Results of Antidumping Duty Administrative Review: Ball Bearings and Parts Thereof from</u>
<u>Japan</u>, 70 Fed. Reg. 69,316 (November 15, 2005), is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the
court in writing on or before Friday, September 7, 2007, whether any information contained in
the Opinion is confidential, identify any such information, and request its deletion from the
public version of the Opinion to be issued thereafter.  The parties shall suggest alternative
language for any portions they wish deleted.  If a party determines that no information needs to
be deleted, that party shall so notify the court in writing on or before September 7, 2007.


__/s/ Evan J. Wallach_____
Evan J. Wallach, Judge


Dated: August 23, 2007
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                         Deputy Clerk